HYDROSTORAGE, INC., A Tennessee corporation, Plaintiff,

v.

NORTHERN CALIFORNIA BOILER-MAKERS LOCAL JOINT APPRENTICESHIP COMMITTEE, an unincorporated association; et al., Defendants.

HYDROSTORAGE, INC., Petitioner,

v.

DIVISION OF APPRENTICESHIP STANDARDS; Gail Jesswein in his capacity as Chief Of The Division of Apprenticeship Standards; California Apprenticeship Council; and Boilermakers Local Joint Apprenticeship Committee, Respondents.

No. C–87–2401–WWS, C–88–0804–WWS.

United States District Court, N.D. California.

May 4, 1988.

Karen E. Ford, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for Hydrostorage, Inc.

John Rea, Dept. of Industrial Relations, San Francisco, Cal., for State defendants.

Julian O. Standen, Deputy Atty. Gen., San Francisco, Cal., for Susan Hamilton & R.T. Rinaldi.

Dalvin J. Abe, Deputy Atty. Gen., San Francisco, Cal., for California Apprenticeship Council.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for Boilermaker Joint Apprenticeship Committee.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

In these consolidated actions, Hydrostorage, Inc., seeks injunctive and other relief against the California Division of Apprenticeship Standards ("DAS"), the Northern California Boilermakers Local Joint Apprenticeship Committee ("JAC"), and other defendants to prevent the enforcement against Hydrostorage of an order of DAS issued pursuant to California Labor Code § 1777.5.

Hydrostorage initially sought to enjoin the DAS hearing on an administrative complaint filed against it by JAC for noncompliance with § 1777.5. The Court declined relief without prejudice, pending the issuance by DAS of a final order. A pro-

posed order was issued on September 25, 1987, by a hearing officer. With minor modifications not relevant to the disposition of this matter,[1] the DAS Appeals Board affirmed the order on January 28, 1988, and the California Apprenticeship Council ("CAC") concurred. The order became effective March 1, 1988. Hydrostorage has exhausted its administrative remedies.

In the determination and order issued by DAS upon the complaint, it found that Hydrostorage was required to apply to the JAC for approval to train apprentices and to pay training fund contributions to the appropriate fund or CAC. The order imposes a civil penalty on Hydrostorage and denies it the right to seek any public works contract in California for a period of one year.

On March 3, 1988, Hydrostorage filed a new complaint for injunctive and other relief against enforcement of the order. It also filed an amended complaint in its original action seeking similar relief. Both plaintiff and defendants have moved for summary judgment. Counsel have had an opportunity to argue and comment on the

1. In substance, the Appeals Board eliminated one of the findings of willfulness.

2. Section 1777.5 states in relevant part:

When the contractor to whom the contract is awarded by the state or any political subdivision, or any subcontractor under him, in performing any of the work under the contract or subcontract, employs workmen in any apprenticeable craft or trade, the contract and subcontractor shall apply to the joint apprenticeship committee administering the apprenticeship standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected; provided, however, that the approval as established by the joint apprenticeship committee or committees shall be subject to the approval of the Administrator of Apprenticeship. The joint apprenticeship committee or committees, subsequent to approving the subject contractor or subcontractor, shall arrange for the dispatch of apprentices to the contractor or subcontractor in order to comply with this section. There shall be an affirmative duty upon the joint apprenticeship committee or committees administering the apprenticeship standards of the craft or trade in the areas of the site of the public work to ensure equal employment and

Court's proposed ruling and their voluminous submissions have been considered. No material facts are in dispute and the matter is ripe for decision.

### Jurisdiction

Hydrostorage seeks relief against enforcement of an order by DAS under § 1777.5 alleging preemption by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* and the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151. The complaint presents a federal question of which this Court has jurisdiction under 28 U.S.C. § 1331. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).

### The Statutory Scheme and the Material Facts

Labor Code § 1777.5 imposes certain requirements on every contractor performing contracts awarded by the State of California or its political subdivisions.[2] In substance, it requires that the contractor:

affirmative action in apprenticeship for women and minorities. Contractors or subcontractors shall not be required to submit individual applications for approval to local joint apprenticeship committees provided they are already covered by the local apprenticeship standards. The ratio of apprentices to journeymen who shall be employed in the craft or trade on the public work may be the ratio stipulated in the apprenticeship standards under which the joint apprenticeship committee operates, but in no case shall the ratio be less than one apprentice for each five journeymen, except as otherwise provided in this section.

The contractor or subcontractor, if he is covered by this section, upon the issuance of the approval certificate, or if he has been previously approved in such craft or trade, shall employ the number of apprentices or the ratio of apprentices to journeymen stipulated in the apprenticeship standards. Upon proper showing by the contractor that he employs apprentices in such craft or trade in the state on all of his contracts on an annual average of not less than one apprentice to each five journeymen, the Division of Apprenticeship Standards may grant a certificate exempting the contractor from the 1–to–5 ratio as set forth in this section.
* * * *
A contractor to whom the contract is awarded, or any subcontractor under him,

1. Obtain a certificate from a joint apprenticeship committee approving the contractor under the apprenticeship standards for employment and training of apprentices in the applicable craft;

2. Employ not less than one apprentice for each five journeymen employed in that craft on the public work; and

3. Contribute to an appropriate fund to administer and conduct the apprenticeship program in that craft.[3]

Under § 1777.7, willful noncompliance with § 1777.5 renders a contractor ineligible to bid on any public works project for one year and subjects him to a civil penalty.

Hydrostorage is a contractor engaged in the construction of water storage facilities. A large part of its work consists of public works contracts. The project giving rise to the instant controversy was a contract to construct water storage tanks for the Lathrop Water District. The work performed fell within the jurisdiction of the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers ("Boilermakers"), a labor organization within the meaning of the NLRA, 29 U.S.C. § 152(5). It is not disputed that § 1777.5 applies to the project, that Hydrostorage did not seek a certificate of approval, and that it employed no apprentices on the project.

During the relevant period, a collective bargaining agreement was in effect between the Boilermakers and numerous employers, but not Hydrostorage. The agreement provided for the establishment and operation of an Apprenticeship Committee and an Apprenticeship Fund and specified contributions to be paid by each employer to the Fund.[4] On September 25, 1986, the JAC, created pursuant to the collective bargaining agreement, filed the complaint with DAS leading to these proceedings, charging Hydrostorage with failure to apply for a certificate of approval, failure to employ apprentices, and failure to contribute to the appropriate fund.

*ERISA Preemption*

■ ERISA subjects to federal regulation "employee welfare benefit plans." It "is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw*, 463 U.S. at 90, 103 S.Ct. at 2896. The term "employee welfare benefit plan" is defined to "mean any plan, fund, or program ... maintained by an employer or by an employee organization, or by both, to the extent that ... [it] was established or is maintained for the purpose of providing for its participants ... apprenticeship or other training programs." 29 U.S.C. § 1002(1).

who, in performing any of the work under the contract, employs journeymen or apprentices in any apprenticeable craft or trade and who is not contributing to a fund or funds to administer and conduct the apprenticeship program in any such craft or trade in the area of the site of the public work, to which fund or funds other contractors in the area of the site of the public work are contributing, shall contribute to the fund or funds in each craft or trade in which he employs journeymen or apprentices on the public work in the same amount or upon the same basis and in the same manner as the other contractors do, but where the trust fund administrators are unable to accept such funds, contractors not signatory to the trust agreement shall pay a like amount to the California Apprenticeship Council. The contractor or subcontractor may add the amount of such contributions in computing his bid for the contract. The Division of Labor Standards Enforcement is authorized to enforce the payment of such con-

tributions to the fund or funds as set forth in Section 227.

The body awarding the contract shall cause to be inserted in the contract stipulations to effectuate this section. Such stipulations shall fix the responsibility of compliance with this section for all apprenticeable occupations with the prime contractor.

**3.** Section 1777.5 provides for certain exemptions and alternatives not relevant here.

**4.** Detailed provisions for the operation of the apprenticeship program are contained in a document entitled Boilermaker Standards of Apprenticeship for Field Construction and Repair in Eight Western States Area (as revised March 27, 1974). Article XXVI provides that "any expenses incurred for the administration of this training program ... shall be borne by the fund that has been established," that being the fund provided for in the collective bargaining agreement.

There can be no question that the Apprenticeship Program under the Boilermakers collective bargaining agreement falls within the literal scope of this definition. It comprises a plan, fund, and program maintained by employers and the bargaining representative of their employees to provide its participants with apprenticeship training.[5] That the Apprenticeship Fund itself may also be governed to an extent by other federal laws, as DAS argues, in no way takes the Apprenticeship Program out of the statutory definition.

Section 514(a) of ERISA states that the act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "State law" is defined to consist of "all laws, decisions, rules, regulations or other State action having the effect of law." 29 U.S.C. § 1144(c)(1). "State" is defined as including "a State ... or any [state] agency ... which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans." 29 U.S.C. § 1144(c)(2). Under these provisions, preemption depends on "whether the [state law] 'relate[s] to' employee benefit plans within the meaning of § 514(a)." *Shaw*, 463 U.S. at 96, 103 S.Ct. at 2899.[6]

"Congress used the words 'relate to' in § 514(a) in their broad sense." *Shaw*, 463 U.S. at 98, 103 S.Ct. at 2900. "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 97, 103 S.Ct. at 2900. The

DAS's determination and order issued under Section 1777.5 compel Hydrostorage to participate in and contribute to the Boilermakers Apprenticeship Program, an ERISA benefit plan. Thus they relate to an ERISA plan. *See generally Hewlett–Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd.*, 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *Standard Oil Co. of California v. Agsalud*, 633 F.2d 760, 763 (9th Cir.1980).

Moreover, the statute establishes the manner in which contractors must participate in the Apprenticeship Program and fund its costs. Thus, the statute regulates matters that are regulated by ERISA. *See, e.g.*, 29 U.S.C. §§ 1082, 1102–1104; *Martori Bros. Distributors*, 781 F.2d at 1357–58; *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1505 (9th Cir.1985).

ERISA therefore preempts the DAS determination and order issued under § 1777.5 unless it is saved by § 514(d) which states

> Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States ... or any rule or regulation issued under any such law.

Defendants argue that § 1777.5 was adopted pursuant to the Fitzgerald Act, 29 U.S.C. § 50, *et seq.*, and the regulations issued by the Secretary of Labor under the Act, 29 C.F.R. Part 29. Because federal law encourages the states to promote and

---

5. Counsel for the JAC conceded as much at the hearing (Tr. 8, lines 11–17).

6. In *Martori Bros. Distributors v. James–Massengale*, 781 F.2d 1349, 1356 (9th Cir.1986), the court held that for a state law to be preempted it must "both 'relate[ ]' to an ERISA plan and 'purport[ ]' to regulate, directly or indirectly' ERISA plans." The Supreme Court did not articulate such a two-pronged test in *Shaw* or elsewhere. It is apparently derived from two decisions of the Second Circuit. *Stone & Webster Engineering Corp. v. Ilsley*, 690 F.2d 323, 329 (2d Cir.1982), *aff'd. mem. sub. nom., Arcudi v. Stone & Webster Engineering Corp.*, 463 U.S. 1220, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983); *Rebaldo v. Cuomo*, 749 F.2d 133, 137 n. 1 (2d Cir.1984). *See also Lane v. Goren*, 743 F.2d 1337, 1339 (9th Cir.1984).

A close reading of § 514 casts doubt on this interpretation. Section 514 preempts "any and all State laws insofar as they may ... relate to any employee benefit plan." Section 514(c)(1) defines "state law" as "includ[ing] all laws, decisions, rules, regulations, or other State action having the effect of law." The reference to regulation of plans appears only in § 514(c)(2) defining "state" to include "a State, any political subdivisions thereof, or any agency or instrumentality of either which purports to regulate ... the terms and conditions of employee benefit plans." Had Congress intended to limit preemption to those state laws that "regulate," it would presumably have included in subsection (c)(1) the words found in subsection (c)(2).

In any event, there can be no question but that § 1777.5 regulates apprenticeship program.

regulate apprenticeship programs, they argue, "state law becomes a way to put into effect federal law. Thus, to interfere with that state law would necessarily 'alter ..., modify ..., impair ... any law of the United States.'" JAC Memo at 6. Their argument rests on *Shaw* in which the Supreme Court applied § 514(d) to save from preemption so much of the New York Human Rights Law as prohibits discriminatory employment practices *that are also prohibited* by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

In *Shaw*, the Court had before it a state anti-discrimination law which, under the express provisions of Title VII, provided the enforcement mechanism for federal antidiscrimination law. As the Court put it,

> Title VII requires recourse to available state administrative remedies. When an employment practice prohibited by Title VII is alleged to have occurred in a State ... which prohibits the practice and has established an agency to enforce the prohibition, the [EEOC] refers the charges to the state agency. The EEOC may not actively process the charges "before the expiration of sixty days after proceedings have been commenced under the State ... law...."

463 U.S. at 101–02, 103 S.Ct. at 2902. The Court concluded that "Given the importance of state fair employment laws to the federal enforcement scheme, pre-emption of the Human Rights Law would impair Title VII to the extent the Human Rights Law provides a means for enforcing Title VII's commands." *Id.* at 102, 103 S.Ct. at 2902. However insofar as state law imposed obligations beyond those imposed by federal law, ERISA preemption would not impair Title VII and therefore § 514(d) will not preclude preemption.

By no stretch of the imagination could § 1777.5 be considered a state law the preemption of which would impair federal law. The Fitzgerald Act merely directs the Secretary of Labor "to formulate and promote the furtherance of labor standards ... to safeguard the welfare of apprentices" and related objectives. 29 U.S.C. § 50. The implementing regulations state that their purpose is "to set forth labor standards to

safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, [of] acceptable apprenticeship programs." 29 C.F.R. § 29.1(b). Thus the regulations relate only to eligibility for federal registration. Neither they nor the Act itself contemplate enforcement mechanisms; Section 29.11 merely provides for the voluntary adjustment of complaints before either federal or state agencies. Assuming § 1777.5 was adopted in furtherance of the objectives of the Fitzgerald Act, it clearly is not an enforcement mechanism of federal law and to the extent orders under this section are preempted by ERISA, federal law is not impaired.

Defendants also argue that footnote 24 of *Shaw* saves the DAS order on the theory that preemption would impair operation of the Fitzgerald Act insofar as the Act encourages states to give broader protection to apprentices than federal law may require. To begin with, the Fitzgerald Act contains no saving clause for state laws. *Shaw* concerned Title VII, which does contain such a clause. *See* Title VII, § 708, 42 U.S.C. § 2000e–7. Moreover, even with respect to Title VII, the Court said that it does no more than "simply [leave state antidiscrimination laws] where they were before the enactment of Title VII." *Shaw*, 463 U.S. at 103 n. 24, 103 S.Ct. at 2903 n. 24. The same is true here.

Finally, the lack of merit of defendants' argument is confirmed by comparing the Fitzgerald Act and the implementing regulations with ERISA, which shows that the former do not deal with the basic subject matter of ERISA, i.e., plan management and distribution of benefits. Specifically, the regulations are silent with respect to creation of or contributions to apprenticeship funds. Thus, there is no apparent conflict between regulations establishing standards for the welfare of apprentices and ERISA regulation of the administration of employee benefit plans which would invoke § 514(d). Presumably this was Congress's view when it included apprenticeship programs in ERISA without evident

concern about conflict with the Fitzgerald Act.

Accordingly it must be concluded that § 514(d) does not save the order issued under § 1777.5 from ERISA preemption.[7]

It may, at first blush, seem odd, and perhaps farfetched, that ERISA should be held to preempt state law provisions and orders requiring public works contractors to participate in apprenticeship programs. However, as the Court stated in *Shaw*, "To give § 514(d) the broad construction advocated by [defendants] would defeat the intent of Congress to provide comprehensive pre-emption of state law." *Id.* at 106, 103 S.Ct. at 2904–05. Moreover, on examination, the program the state imposes on contractors falls squarely within the purposes of ERISA as recently articulated by the Supreme Court:

These statements reflect recognition of the administrative realities of employee benefit plans. An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements. The most efficient way to meet these responsibilities is to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with

certain fiduciary standards in some States but not in others.

We have not hesitated to enforce ERISA's preemption provision where state law created the prospect that an employer's administrative scheme would be subject to conflicting requirements. *Fort Halifax Packing Co., Inc. v. Coyne,* — U.S. ——, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987).[8]

Defendants concede that the Boilermakers Apprenticeship Fund is subject to ERISA as well as the Labor–Management Relations Act, 29 U.S.C. § 186(c)(6), but argue that the JAC is a separate entity. The argument, of course, misconceives the issue which is that state law requires public works contractors to participate in an ERISA–type benefit program and contribute to an ERISA fund.

The holding that the DAS determination and order under § 1777.5 are preempted by ERISA should not be taken as denigrating the desirability of apprenticeship programs, invalidating the State's policy to promote such programs, or denying state authority to regulate the conditions of employment of apprentices. The Court recognizes that federal policy favors "the formulation of programs of apprenticeship," as reflected in the Fitzgerald Act, 29 U.S.C. § 50, *et seq.*

The Court has not been asked to strike down § 1777.5 nor does it do so by this order which holds only that as applied in this case it is preempted by ERISA. In light of what has been said here about the Fitzgerald Act and the implementing regulations, the State may be able to adopt standards to safeguard the welfare of apprentices that do not run afoul of ERISA. In any event, that is not an issue that need be decided here.

### *NLRA Preemption*

█ It is not disputed that in order to participate in the apprenticeship program

---

7. In view of this conclusion, it is unnecessary to consider whether § 1777.5 and § 1777.7 are also preempted as being enforcement schemes. *See Pilot Life Ins. Co. v. Dedeaux,* — U.S. ——, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

8. The Boilermakers Fund is identified in the collective bargaining agreement as the Nine Western States Area Apprenticeship Fund. Thus contributions are obviously made by employers in different states.

mandated by the DAS order, Hydrostorage would have to execute an Agreement to Train Apprentices. Under the terms of that Agreement, Hydrostorage would become bound by the Apprenticeship Standards and Apprentice Agreement which are a part of the Boilermakers collective bargaining agreement as Appendix D.

Under Appendix D, the employer agrees, among other things, to be bound by the agreement and declaration of trust establishing the Boilermakers Area Apprenticeship Funds and any amendments, and to make contributions to the Funds as required by the JAC. The collective bargaining agreement itself contains provisions respecting the employment of apprentices, including rates of pay and the minimum ratio of apprentices to journeymen. By signing the Agreement to Train Apprentices, the employer apparently becomes bound by these provisions.

Thus, by requiring Hydrostorage to execute the Boilermakers Agreement to Train Apprentices, the order would make it an involuntary party to Appendix D and certain other provisions of the collective bargaining agreement, although it had no part in the negotiation of that agreement and has not accepted it. It would, moreover, be subject not only to those agreements but also to any future changes that may be negotiated by the union and the employer parties.[9]

The Supreme Court has only recently summarized the controlling principles:

> Last Term, in *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724 [105 S.Ct. 2380, 85 L.Ed.2d 728] (1985), we again noted: "The Court has articulated two distinct NLRA preemption principles." *Id.,* at 748 [105 S.Ct. at 2394]. See also *Belknap, Inc. v. Hale,* 463 U.S. 491, 498–499 [103 S.Ct. 3172, 3176–3177, 77 L.Ed.2d 798] (1983). The first, the

so-called *Garmon* pre-emption, see *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed. 2d 775] (1959), prohibits States from regulating "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wisconsin Dept. of Industry v. Gould Inc., ante* [475 U.S.], at 286 [106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)]. The *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the "integrated scheme of regulation" established by the NLRA. *Ante,* at 289 [106 S.Ct. at 1062]. See *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S., at 748, and n. 26 [105 S.Ct. at 2394 and n. 26].... Although the labor-management relationship is structured by the NLRA, certain areas intentionally have been left " 'to be controlled by the free play of economic forces.' " *Machinists,* 427 U.S., at 140 [96 S.Ct. at 2553], quoting *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144 [92 S.Ct. 373, 377, 30 L.Ed.2d 328] (1971). The Court recognized in *Machinists* that " 'Congress has been rather specific when it has come to outlaw particular economic weapons,' " 427 U.S., at 143 [96 S.Ct. at 2555], quoting *NLRB v. Insurance Agents,* 361 U.S. 477, 498 [80 S.Ct. 419, 421, 4 L.Ed.2d 454] (1960), and that Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance " 'between the uncontrolled power of management and labor to further their respective interests.' " *Machinists,* 427 U.S. at 146 [96 S.Ct. at 2556], quoting *Teamsters v. Morton,* 377 U.S. 252, 258–259 [84 S.Ct. 1253, 1257–1258, 12 L.Ed.2d 280] (1964). States are therefore prohibited from imposing additional restrictions on economic weapons

---

9. Section 1777.5 provides that "where the trust fund administrators are unable to accept such funds, contractors not signatory to the trust agreement shall pay a like amount to the California Apprenticeship Council." None of the parties contends that this exception applies here. But even if it did and if it gave Hydrostorage an option to make its contribution to the CAC, Hydrostorage would still be required under § 1777.5 "to apply to the joint apprenticeship committee administering the apprenticeship standards of the craft," in this case the Boilermakers. And that application, as has been seen, has the effect of making it an involuntary party to substantial portions of the collective bargaining agreement.

of self-help, such as strikes or lockouts, see 427 U.S., at 147 [96 S.Ct. at 2556], unless such restrictions presumably were contemplated by Congress.

*Golden State Transit Corp. v. Los Angeles,* 475 U.S. 608, 613–15, 106 S.Ct. 1395, 1398–99, 89 L.Ed.2d 616 (1986).

By requiring Hydrostorage to become a party to certain provisions of the Boilermakers collective bargaining agreement, DAS is intruding into the area of collective bargaining from which Congress under the NLRA has excluded it. As the Court explained in *Golden State:* "The NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach agreement." *Id.* at 616, 106 S.Ct. at 1399–1400. It is clear that a state cannot penalize an employer for not becoming a party to a collective bargaining agreement, in whole or in part, which it did not voluntarily negotiate.

Because application of the DAS determination and order would in this case have that effect, it is barred by the NLRA independent of ERISA preemption.

### Conclusion

For the reasons stated, the motion of Hydrostorage for summary judgment is granted. Defendants are permanently enjoined from enforcing the DAS determination and order against Hydrostorage in connection with the Lathrop project.

Defendants' motions for summary judgment are denied.

IT IS SO ORDERED.