GENERAL ELECTRIC
COMPANY, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF LABOR; Thomas P. Hartnett, Industrial Commissioner of the State of New York; Charles Drobner, Director of Public Work, New York State Department of Labor; Robert Abrams, Attorney General of the State of New York, Defendants.

No. 88 Civ. 5154 (RLC).

United States District Court,
S.D. New York.

Sept. 29, 1988.

Vedder, Price, Kaufman, Kammholz & Day, New York City, for plaintiff; Virgil B. Day, Loraine M. Cortese–Costa, Marc S. Wenger, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants; Jane Lauer Barker, Asst. Atty. Gen., in Charge of Labor Bureau, Richard S. Corenthal, M. Patricia Smith, Asst. Attys. Gen., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff General Electric Company ("GE") entered a contract with the Long Island Railroad ("LIRR") to service electric transformers owned by the railroad and located on Long Island. New York State has sought to enforce its so-called prevailing wage law against GE in connection with this contract, and GE has responded by seeking declaratory and injunctive relief against the state. At a hearing held July 26, 1988, the parties stipulated to a continuation of the status quo pending the court's expedited decision on GE's motion for a preliminary injunction. It was agreed that the sole issues for court determination were (1) whether New York's prevailing wage law, N.Y.Lab.Law § 220 (McKinney 1986), is pre-empted by either the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, or the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and (2) whether Section 220 may properly be applied to the LIRR in any case. The parties agreed that these were purely legal questions and that no factual presentation was required. The issues were fully discussed in the briefs filed. We now proceed to determination.

*Background*

Section 220 of New York's Labor Law ("Section 220") requires contracts for the performance of public work to contain provisions which (1) limit the working day of laborers employed under the contract and (2) require them to be paid wages and benefits which at least equal prevailing wages and benefits paid to laborers employed in the same trade or occupation in that locality. N.Y.Lab.Law § 220(2)–(3).

If at least thirty percent of the laborers employed in a particular trade are covered

by collective bargaining agreements in a particular locality, then the prevailing wages and benefits which public works contractors are required to pay are determined by reference to those agreements. Otherwise, the prevailing wage under the statute is the "average wage" paid in the trade in that locality. *Id.* § 220(5)(a).

In January, 1987, GE entered a contract with the LIRR to service and repair electric transformers located in Kings, Queens, Nassau, and Suffolk counties. The contract specifications included a schedule of prevailing wages and benefits based on two collective bargaining agreements concluded by locals of the International Brotherhood of Electrical Workers ("IBEW"), one covering laborers employed in Queens and Kings Counties, and one covering laborers employed in Nassau and Suffolk Counties.

Performance of the contract was undertaken by General Electric Apparatus and Engineering Services—New York Service Center, a sub-entity of GE. The Service Center's principal place of business is in North Bergen, New Jersey, but the work at issue in this case was performed in New York State. The Service Center's employees are represented by Local 3, IBEW, and collective bargaining agreements between Local 3 and GE have been in force during the entire period at issue. These agreements provide for the payment of wages and benefits which are different from, and in some cases less than those which the state claims are due under Section 220.

In conformity with a decision issued by the New York Court of Appeals, *Action*

*Electrical Contractors Co., Inc. v. Goldin*, 64 N.Y.2d 213, 485 N.Y.S.2d 241, 474 N.E. 2d 601 (1984), the state interprets Section 220 as allowing employers to provide required benefits in the form of cash payments equal to the employer cost of the required benefits in lieu of providing the benefits themselves. However, the department does not allow the cost of benefits that do not qualify as "prevailing benefits" to be counted as an offset towards an employer's obligation to provide required benefits or their cash equivalent. Thus, GE received no credit under the statute for its cost of providing benefits which were not deemed to be "prevailing benefits" by the Commissioner.

The record before the court does not permit any conclusion to be drawn as to the identity or nature of the benefits for which GE has been denied credit. While GE has suggested that these exclusions add to the illegality of the state's actions in this case, no specific claim has been made that they are improper, and this decision does not consider that issue.[1]

*Determination*

## A. NLRA Pre-emption

■ The NLRA pre-empts state law in two situations.[2] The first is "when it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." [3] *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775

---

1. It may also be the case, though the submitted documents are unclear on this question, that the state does not allow excess costs incurred by an employer in providing a particular benefit to be counted as an offset towards the employer's obligation to provide another benefit which is under-funded according to the prevailing benefit standard. In other words, it may be the case that the state treats each prevailing benefit as a separate obligation which is either satisfied or not, based on whether the cost incurred by the employer in providing that particular benefit (or in the form of a cash payment offered in lieu of the benefit) equals or exceeds the prevailing standard for that benefit. *See* Bleiberg aff., ¶ 11, and Exhibits C, D; Whittaker aff., ¶ 26; Plaintiff's Complaint, Exhibit B. This decision passes no judgement on the propriety of exclu-

sions of this type either. Indeed, by agreeing to have the court issue its decision upon submissions, the parties agreed at least sub silentio that these issues were not before the court.

2. See *Metropolitan Life Ins. Co. v. Mass.*, 471 U.S. 724, 748–51, 105 S.Ct. 2380, 2993–95, 85 L.Ed.2d 728.

3. Section 7 of the NLRA (codified as 29 U.S.C. § 157) protects the right of employees to engage in concerted activity or to refrain from such activity. Section 8 of the act (codified as 29 U.S.C. § 158) declares certain practices by employers and employees to be prohibited unfair labor practices.

(1959). As the Court explained, "[t]o leave the states free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." *Id.* More recently, the Court explained the purpose of the *Garmon* rule as the protection of "the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA." *Metropolitan Life Ins. Co. v. Mass,* 471 U.S. 724, 748, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985).

The second type of federal pre-emption occurs when a state attempts to regulate an activity which Congress intended to be left unregulated, even though the activity is arguably neither protected by Section 7 nor prohibited by Section 8 of the NLRA. The rationale for this type of pre-emption is to avoid upsetting "the balance of power between labor and management expressed in our national labor policy." *Teamsters v. Morton,* 377 U.S. 252, 260, 84 S.Ct. 1253, 1258, 12 L.Ed.2d 280 (1964).[4]

This second type of pre-emption is illustrated by the holding in *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In *Machinists,* the Court held that a state could not enjoin a concerted refusal to work overtime on the basis of state law, even though the Regional Director of the National Labor Relations Board had determined that the activity "was not conduct cognizable by the Board." *Id.* at 135, 96 S.Ct. at 2550. The Court reasoned that Congress intended to leave such weapons of economic self-help unregulated.

GE contends that Section 220 is pre-empted under both *Garmon* and *Machinists.* I disagree. *Garmon* is inapplicable since the contested state action here does not attempt to regulate an activity which is either protected or prohibited under the NLRA. Sections 7 and 8 of the NLRA are not concerned with the substantive outcome of the collective bargaining process, and efforts by states to limit the outcome of that process do not impinge on the jurisdiction of the NLRB to determine what employer and employee conduct the NLRA prohibits or permits.[5]

The inapplicability of the *Garmon* rule is illustrated by *Local 24 of the International Brotherhood of Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), a case on which GE places considerable reliance. In *Oliver,* the Court held that a state anti-trust law was pre-empted by the NLRA. The statute at issue had been applied to invalidate provisions of a collective bargaining agreement regulating rental and other terms of leases under which truck drivers leased and operated their vehicles for lessee common carriers. Finding that the purpose and effect of the contract provisions were to fix wages and not prices, the Court held that the statute impermissibly interfered with the right and duty of the carriers and their employees to engage in collective bargaining regarding wages, hours, and other terms and conditions of employment.

To be sure, the opinion contains language indicating that the state anti-trust statute may not be applied "to prevent the contracting parties from carrying out their agreement upon a subject matter as to which federal law directs them to bargain," *id.* at 295, 79 S.Ct. at 304, but the issue before the Court was not whether the state could impose substantive limits on the outcome of collective bargaining, but whether

---

**4.** In *Morton* the Court held that damages could not be awarded to an employer on the basis of a state law claim concerning peaceful secondary boycott activity undertaken by a group of employees, even though the activity was arguably neither protected nor prohibited by the NLRA. The Court reasoned that by expressly allowing the federal courts to award damages to persons injured by certain kinds of secondary boycott activity, Congress intended to leave other kinds of secondary boycott activity unregulated in order "to leave this weapon of self-help available" to participants in a labor dispute. *Morton,* 377 U.S. at 258–60, 84 S.Ct. at 1257–59.

**5.** "The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metropolitan Life,* 471 U.S. at 753, 105 S.Ct. at 2396.

the state could use an antitrust statute to prohibit employers and employees from engaging in collective bargaining. The Court found that the effect of the statute at issue in *Oliver* was to prevent collective bargaining over wages. Section 220, however, does not prevent GE from exercising its right and duty to engage in collective bargaining regarding wages and benefits. It merely imposes a floor on the wages GE can bargain for. The issue of whether states may impose such substantive limits on the outcome of collective bargaining was not addressed in *Oliver*.

In an effort to support its claim of federal pre-emption under *Garmon* principles, GE characterizes the state's action in enforcing Section 220 as an effort "to mandate a violation of NLRA 8(a)(5) by requiring GE to unilaterally alter the terms and conditions of employment established under its agreement." Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction, p. 12. GE argues that it is being required "to 'replace' the wages and benefits contained in its [collective bargaining] Agreement with those in other collective bargaining agreements." Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, p. 4 [hereinafter "Plain. Reply Mem."].

If Section 220 actually did require GE to "replace" its collective bargaining agreement with another, then the *Garmon* rule would be implicated, but Section 220 does not do that.[6] The only obligation imposed on GE is to comply with the minimum standards which the state has imposed.[7] Thus, rather than involving Sections 7 or 8 of the NLRA, the gravamen of GE's claim is that the state's establishment of these minimum standards regulates a matter which Congress intended to be left unregulated. Such a claim raises issues which has been addressed not in the *Garmon* line of cases, but in the line of cases articulating the principles of *Machinists* pre-emption.

The particular decision in the *Machinists* line of cases which is dispositive on the propriety of such standards is *Metropolitan Life*. In that case, a unanimous Court upheld a state statute that required certain minimum health care benefits to be included in employee health care plans covering hospital and surgical expenses. The appellants in that case made the same argument that GE has made, namely, that in enacting the NLRA Congress "intended to prevent the states from establishing minimum employment standards that labor and management would otherwise have been required to negotiate from their federally protected bargaining positions, and would otherwise have been permitted to set at a lower level than that mandated by state law." *Metropolitan Life*, 471 U.S. at 751, 105 S.Ct. at 2395. The Court rejected this argument.

> "[T]here is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization.... Federal labor law in this sense is interstitial, supplementing

---

**6.** GE also contends that reliance on collective bargaining agreements to determine prevailing wage and benefit standards brings Section 220 within the scope of the holding in *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 212, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). This claim is without merit. In *Lueck* the Court held that "state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement, are pre-empted by those agreements." *Id.* at 213, 105 S.Ct. at 1912. The right of workers employed on public works in New York State to be paid prevailing wages is derived from Section 220. It cannot be said to originate in the collective bargaining agreements which the state uses to determine prevailing rates, since the right would exist even if there were no collective bargaining agreements in effect in the state.

**7.** To be sure, the State relies on collective bargaining agreements to determine prevailing wages and benefits (when at least thirty percent of the laborers employed in a particular trade are covered by such agreements), but public works contractors do not have to enter a collective bargaining agreement to engage in public work, nor do they have to replace any collective bargaining agreements they may have with their employees. They remain free, whether under the terms of a collective bargaining agreement or spontaneously, to pay more than the State's minimum standards require.

state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act. *Id.* at 756, 105 S.Ct. at 2397.

To overcome this holding GE argues that a *prevailing* wage statute like Section 220 does not establish *minimum* labor standards, because:

> "a prevailing wage is in the nature of an average wage (and contractors in the locality and throughout the state will pay above and below the rate) which varies from year to year and in accordance with the economic climate which dictates the outcome of industry/union negotiations; employees of the state and its municipalities who perform public work do not receive the wage; prevailing wage requirements are not generally applicable to private persons and corporations, except when such persons contract with the state; and, the prevailing wage is not set by statute but is derived from private agreements throughout the state."

Plain. Reply Mem. at 9–11 (footnote omitted).

This argument is unpersuasive. The state's standards are indeed based on prevailing rather than minimum wages paid in the private sector, but once the standards have been determined by the Commissioner, they have a legal effect on covered employers and employees exactly like other minimum wage statutes. Nor does the fact that these standards are determined by an administrative process alter their character as obligations imposed by statute. It also does not matter that the coverage of the statute is limited and that it requires the payment of wages above those which uncovered employees may be paid. The coverage of minimum wage statutes is rarely universal,[8] and the state has a rational reason for applying this statute to the employees of private contractors engaged in performing public work and for setting its minimum standards at the level it has selected.[9]

The cases which GE cites in support of its position are all distinguishable. In *Golden State Transit Corp. v. Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), the city conditioned a franchise renewal on the settlement of an ongoing labor dispute, thus impermissibly intruding itself into the collective-bargaining process. As the Court noted, "[e]ven though agreement is sometimes impossible [in free collective bargaining], government may not step in and become a party to the negotiations." *Id.* 106 S.Ct. at 1401. No similar circumstance exists in the instant case.

In *Hydrostorage, Inc. v. Northern California Boilermakers,* 685 F.Supp. 718 (N.D.Cal.1988), the NLRA was held to preempt a statute requiring contractors engaged in public works to participate in a mandated apprenticeship training program, because it would require the plaintiff "to become a party to certain provisions of the Boilermakers collective bargaining agreement." *Id.* at 725. Citing *Golden State,* the court reasoned that "a state cannot

---

8. When initially enacted, the federal minimum wage covered only about 43 percent of all non-supervisory wage and salary workers, mainly those employed in larger firms involved in extensive interstate commerce. *See* R. Ehrenberg & R. Smith *Modern Labor Economics* 77–79 (3d ed. 1988). Even today, the federal minimum wage covers less than 90 percent of all nonsupervisory wage and salary workers. *See* Smith and Vavrichek, *The Minimum Wage: Its Relation to Incomes and Poverty,* 110 Monthly Lab. Rev. 24 (June 1987).

9. The New York Constitution requires laborers, workmen and mechanics employed by a contractor performing public work to be paid prevailing wages and work no more than eight hours a day and five days a week. N.Y. Const. art. 1, § 17. Section 220 gives effect to this constitutional provision. New York courts have interpreted the statute as intending "to insure that workmen on public projects will receive an adequate wage," and as affording "protection to a contractor by giving him some foreknowledge of potential labor costs when bidding on such projects." *Brang Co. v. State U. Const. Fund,* 47 A.D.2d 178, 365 N.Y.S.2d 914, 916 (3d Dept. 1975). The purpose of the amendments to the statute which brought wage supplements within its purview has been described as "a concern to equalize contractors' minimum labor costs," so that employers who do not provide fringe benefits to their employees would not have a competitive advantage in bidding on public works contracts. *Action Electrical Contractors. Co. v. Goldin,* 64 N.Y.2d 213, 222, 485 N.Y.S.2d 241, 245, 474 N.E.2d 601 (1984).

penalize an employer for not becoming a party to a collective bargaining agreement, in whole or in part, which it did not voluntarily negotiate." *Id.* Under Section 220, GE would be required to pay certain minimum wages and supplements, not enter a collective bargaining agreement.

In *Bechtel Construction v. United Brotherhood of Carpenters*, 812 F.2d 1220 (9th Cir.1987), the court held that an across-the-board wage reduction negotiated in a collective bargaining agreement did not have to give way to a higher wage schedule contained in an "Agreement to Train Pipe Trades Apprentices" which the plaintiff construction company had entered with an industry apprentice training program operated jointly by labor and management representatives. The "Apprenticeship Agreement" included a wage rate schedule approved by the California Division of Apprenticeship Standards in conformity with state law. The holding was principally based on the court's finding that "California law cannot reasonably be interpreted to place its apprenticeship wage standards above the collective bargaining process," *id.* at 1222, but the court went on to "consider only briefly whether federal labor law forbids what is forbidden by California law." *Id.* at 1225.

With respect to this latter issue, the *Bechtel* court concluded that "[t]he negotiation of wage rates . . . is protected activity under section 7" of the NLRA, and that section 7 "would therefore preempt any attempt to enforce the Approved Standards against collectively bargained-for wage rates." *Id.* Recognizing that "*Metropolitan Life* seems at first glance to contradict [this] conclusion," the court cited two factors which distinguished *Bechtel* from that case.

First, the court reasoned that the standards at issue in *Bechtel* were not like the minimum labor standards protected in *Metropolitan Life*, because they could be "undercut" with the approval of the state agency charged with enforcing the standards,[10] and "[a] 'minimum' by definition cannot be undercut." *Id.* at 1225–26. Secondly, the court reasoned that "the Court in *Metropolitan Life* failed to consider that such standards can sometimes have a serious effect on the collective bargaining process," because the higher wages which the state sought to enforce for apprentices would upset the wage scale for which higher-level tradespeople had bargained.

There is no real support for GE's position in this holding. Unlike the California standards at issue in *Bechtel*, the wage and hours standards established under the authority of Section 220 cannot be "undercut" with the consent of the state agency charged with enforcing them, and the standards apply to all tradespeople, not just to one grade of labor.[11]

---

**10.** In support of its interpretation of state law, the appellant union and apprenticeship training program had relied on an "Information Bulletin" issued by the state Division of Apprenticeship Training which indicated that when a lower rate of pay is negotiated for apprentices in a collective bargaining agreement, the wages specified in the agency's "Approved Standards" had to be paid until a wage revision was submitted and approved by the Division of Apprenticeship Training.

**11.** Furthermore, the *Bechtel* court's reading of the holding in *Metropolitan Life* can be criticized as excessively narrow. First, the *Bechtel* court's holding that "a 'minimum' by definition cannot be undercut" is hard to reconcile with *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), in which minimum severance payment standards were held to be minimum labor standards even though they could be undercut by private severance payment agreements between employers and their employees. *Id.* 107 S.Ct. at 2213, n. 1, 2222–23. Clearly, minimum labor standards do not have to be impregnable to undercutting to avoid pre-emption. Secondly, the *Bechtel* court's holding that the California wage standards were pre-empted because they did not affect all workers equally (and therefore disrupted wage scales for which higher-level tradespeople had bargained) is hard to reconcile with the protection afforded by *Metropolitan Life* to state minimum wage statutes. *Metropolitan Life*, 471 U.S. at 755, 105 S.Ct. at 2397. Minimum wage statutes have the very same effect which concerned the *Bechtel* court. In practice, they too apply only to the lowest grade of labor employed in an enterprise and can therefore disrupt wage scales for which higher-level tradespeople have bargained. Thus, it is hard to understand how this consideration supports a holding that the California statute at issue in *Bechtel* is pre-empted.

■ The Supreme Court did not define the scope of the "minimum labor standards" category in *Metropolitan Life,* but there is no reason to give the term a restricted interpretation. As the Court commented in *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 2222, 96 L.Ed.2d 1 (1987), "pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." Certainly, no blanket prohibition of state regulations having a substantive impact on the collective bargaining process can properly be read into the NLRA. It is always necessary to determine whether Congress intended to permit the type of state regulation at issue.

For example, in *Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed. 2d 443 (1978), the Court looked to the federal statute which regulated the disclosure of information by private pension plans prior to ERISA to determine whether Congress intended the NLRA to pre-empt state authority to regulate pension plans.[12]

The same analytical approach was used by the Court in *New York Telephone Co. v. New York Labor Dept.,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). The Court acknowledged that New York's practice of permitting strikers to collect unemployment compensation benefits "altered the economic balance between labor and management," and that this arguably brought the case within the purview of the *Machinists* rule for NLRA pre-emption. *Id.* at 531–32, 99 S.Ct. at 1336–37. Nevertheless, as in *Malone,* the Court did not accept the proposition that the NLRA impliedly pre-empts all state action which affects the outcome of collective bargaining, but instead looked to the legislative history of the Social Security Act (which was en-

acted the same summer as the NLRA) to determine that Congress did not intend the NLRA to prohibit states from providing unemployment compensation benefits to strikers.

The common thread in the Supreme Court's "minimum labor standard" concept is not a dictionary definition of "minimum," nor a requirement that the minimum standards be neutral in their effect on the collective bargaining process, but a judgement that the substantive rights which the state seeks to create are consistent with the "general legislative goals of the NLRA." *Metropolitan Life,* 471 U.S. at 757, 105 S.Ct. at 2398.

These goals are not purely procedural. In enacting the NLRA Congress intended not only to provide for free collective bargaining, but thereby to help the nation overcome a variety of economic problems attributable to depressed and unstable wage rates.[13] Consistency with these goals is the real touchstone of the "minimum labor standard" concept articulated in *Metropolitan Life:*

The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement. No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general

---

**12.** Pre-emption of the Minnesota statute by ERISA was acknowledged, but the case involved state regulation of pension plans prior to the enactment of ERISA.

**13.** "The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association sub-

stantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries." 29 U.S.C. § 151.

goals of the NLRA. *Metropolitan Life,* 471 U.S. at 754–55, 105 S.Ct. at 2397. Consistency between the purposes of Section 220 and the express goals of the NLRA therefore provides further support for the conclusion that the prevailing wage standards established under the statute are minimum standards within the meaning of *Metropolitan Life.*

B. ERISA Pre-emption

 Whether ERISA pre-empts Section 220 on its face has already been decided by this court in an unpublished memorandum endorsement by Judge Sand in *Rondout Electric Inc., v. New York State Department of Labor, et al.,* 84 Civ. 3095 (S.D.N.Y.1984) (Sand, J.). The facts in that case were essentially the same as in this one. The plaintiff had entered a contract with a municipality to perform work on its sewage treatment plant, and the state had commenced administrative proceedings to enforce the provisions of Section 220 relating to wage supplements. Without first exhausting its administrative remedies under state law, the plaintiff sought declaratory and injunctive relief based on the theory that ERISA's very broad pre-emption clause, 29 U.S.C. § 1144, invalidates Section 220 on its face.

In granting the state's motion for summary judgment with respect to the ERISA pre-emption claim, Judge Sand reasoned that:

> Plaintiff cannot validly maintain that the New York State prevailing wage law on its face is pre-empted by ERISA merely because employee benefit plans are considered in determining the total compensation package paid to employees in the industry and locality. The statute does not require the maintenance of such plans, regulate their terms or do anything other than consider the value to the employee of contributions to such plans as compared to the value of contributions

made to similar plans by other employers in the industry and locality. An analogy may be helpful. If it was a practice in a particular industry and locality to pay employee bonuses in United States Savings Bonds, the fact that the actual value of such payments would be considered in determining the "prevailing wage" would no more constitute an invalid intrusion by the state into United States Treasury matters than does New York's consideration of the value of contributions made to federally regulated employee benefit plans. The Court recognizes the broad scope of federal pre-emption where a state in fact seeks to regulate ERISA plans, but such is not the case here. *Id.* at 3.

This reasoning is persuasive and I adopt it to dispose of GE's identical claim. As with the plaintiff in *Rondout,* GE's further claim that Section 220 interferes with employee benefit plans in its practical effect is not ripe for review on this record. If issues exist under either state or federal law as to the propriety of the state's administration of the statutory scheme (including the state's practice of disregarding the cost to an employer of benefits which are deemed not to be prevailing supplements, or the state's possible practice of disallowing excess expenditures for one benefit to be used as a set-off against the employer's other obligations) then GE may raise them when they are ripe for review.

C. The Applicability of Section 220 to the LIRR

 GE claims that application of Section 220 to the LIRR is impermissible under both state and federal law. We are barred by the Eleventh Amendment from considering the state law claim, *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984),[14] so the only issue to be decided is whether federal law pre-empts application

---

**14.** GE argues against this conclusion on the theory that the State has waived its Eleventh Amendment immunity by operating a railroad in interstate commerce. *See Parden v. Terminal Railway,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). It is the New York State Department of Labor which is a defendant in this suit, though, not the LIRR. Where the State or one of its agencies is named as the defendant, the Eleventh Amendment clearly does apply. *Pennhurst,* 465 U.S. at 100, 104 S.Ct. at 907.

**1102**

of Section 220 to work contracted with the LIRR.

GE argues that pre-emption exists on the basis of the general interest of the federal government in regulating railways engaged in interstate commerce. The Commerce Clause clearly gives the federal government the right to regulate interstate railways. *United Transportation Union v. Long Island Railroad Co.,* 455 U.S. 678, 682–83, 102 S.Ct. 1349, 1352–53, 71 L.Ed.2d 547 (1982). Thus, Congress *could* enact a statute that would pre-empt application of Section 220 to the railroad's contractors. The issue, though, is whether Congress has in fact enacted such a statute. GE identifies none but urges the view that pre-emption can be based on the fact that Congress has chosen to regulate some other aspects of railroad operations. This is a theory of pre-emption which this court declines to follow.

*Conclusion*

Having found no merit in plaintiff's claims that Section 220 is pre-empted on its face by the NLRA, ERISA, or other federal statutes, plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.