891 F.2d 719
 58 USLW 2368, 114 Lab.Cas. P 56,163,
11 Employee Benefits Cas. 2225
 HYDROSTORAGE, INC., a Tennessee Corporation, Plaintiff-Appellee,
v.
NORTHERN CALIFORNIA BOILERMAKERS LOCAL JOINT APPRENTICESHIP
COMMITTEE, an unincorporated association; Division of
Apprenticeship Standards; Gail W. Jesswein, in his capacity
as Chief of the Division of Apprenticeship Standards;
California Apprenticeship Council, Defendants-Appellants.
 Nos. 88-2798, 88-2800, 88-2802, 88-2966, 88-2968 and 88-2969.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 8, 1989.
Decided Dec. 6, 1989.
 
 John M. Rea, Chief Counsel, Dept. of Indus. Relations, Miles Washington, Deputy Atty. Gen., David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, and Marsha S. Berzon, Altshuler & Berzon, San Francisco, Cal., for defendants-appellants.
 Karen E. Ford, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiff-appellee; James P. Baker, San Francisco, Cal., on brief.
 Appeal from the United States District Court for the Northern District of California.
 Before WALLACE and NOONAN, Circuit Judges, and BURNS,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 In these consolidated appeals, the Northern California Boilermakers Joint Local Apprenticeship Committee, California Apprenticeship Council, and California Division of Apprenticeship Standards (collectively Boilermakers) appeal from the district court's summary judgment in favor of Hydrostorage, Inc. (Hydrostorage). The district court enjoined the enforcement of an administrative order against Hydrostorage, concluding that such enforcement was preempted by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a), and by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. On appeal, Boilermakers argue that the district court (1) lacked subject matter jurisdiction, (2) erred in failing to abstain under either the Younger or Pullman doctrines, and (3) erred in granting summary judgment based on ERISA and NLRA preemption. The district court exercised jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.
 
 
 2
 * This case arises out of California's efforts to regulate apprenticeship on public works projects. California's general administrative framework for regulating apprenticeships is complex. The California Apprenticeship Council (Council) is a six-member entity created by state statute and empowered to issue rules and regulations establishing minimum standards of wages, hours, and working conditions for apprentices. Cal. Labor Code §§ 3070, 3071 (West Supp.1989). The Council is located in the Division of Apprenticeship Standards (Division), which in turn is part of California's Department of Industrial Relations. Id. The Director of Industrial Relations serves as the Administrator of Apprenticeship (Administrator), in which capacity he or his delegees carry out such duties as investigating and determining charges of alleged violations of the terms of apprenticeship agreements. Cal. Labor Code §§ 3072, 3081 (1971); 8 Cal.Code Reg. § 202 (1988). A determination by the Administrator may be appealed to the Council. Cal. Labor Code § 3082 (West Supp.1989); 8 Cal.Code Reg. § 203 (1988).
 
 
 3
 The Division approves written apprenticeship standards which are submitted to it, if those standards conform to the Council's minimum requirements. Cal. Labor Code § 3073 (West Supp.1989); 8 Cal.Code Reg. § 212 (1988). Standards of apprenticeship may be submitted for approval by any "apprenticeship program sponsor," which includes joint apprenticeship committees, unilateral labor or management apprenticeship committees, or individual employers. Cal. Labor Code § 3075 (West Supp.1989). For the craft of boilermaker, the Council in May 1974 approved a set of apprenticeship standards contained in a document entitled "Boilermakers Standards of Apprenticeship for Field Construction and Repair in Eight Western States Area" (Standards). Subsequent to 1974, the Standards were amended to implement an equal employment opportunity program approved by the Division.
 
 
 4
 An employer in California may gain the right and responsibility to train Boilermaker apprentices in either of two ways. Employers who are signatory to the collective bargaining agreement with the relevant union--the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers (Union)--become bound to the Standards by virtue of a clause in the collective bargaining agreement which so stipulates. On the other hand, employers who are not parties to the collective bargaining agreement (such as non-union contractors or contractors signatory to some other collective bargaining agreement) must apply to a local joint apprenticeship committee for approval to train on public works projects in accordance with the Standards. Cal. Labor Code § 1777.5 (West Supp.1989); 8 Cal.Code Reg. § 229 (1988). Contractors approved to train by the joint apprenticeship committee are sent a certificate of approval.
 
 
 5
 Hydrostorage, a Tennessee corporation, is not a signatory to the Union's collective bargaining agreement. Hydrostorage is a contractor engaged in the construction of water storage facilities. Much of Hydrostorage's work consists of public works projects. In the fall of 1986, Hydrostorage was awarded a public works contract to construct a water storage tank for the Lathrop County Water District in Lathrop, California (Lathrop project).
 
 
 6
 The State of California imposes certain conditions relating to apprentices upon contractors and subcontractors who perform contracts awarded by the state or its political subdivisions. See Cal. Labor Code § 1777.5 (West Supp.1989).[1] Under section 1777.5 of the California Labor Code, contractors, with certain exceptions not relevant to this case, must (1) "apply to the joint apprenticeship committee administering the apprenticeship standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected"; (2) employ apprentices in a ratio of no less than one apprentice for every five journeymen; and (3) "contribute to the fund or funds in each craft or trade in which [the contractor] employs journeymen or apprentices on the public work in the same amount or upon the same basis and in the same manner as the other contractors do." Id. As for the contribution requirement, if apprenticeship "trust fund administrators are unable to accept [the] funds, contractors not signatory to the trust agreement" must pay "a like amount to the California Apprenticeship Council." Id.
 
 
 7
 The Northern California Boilermakers Local Joint Apprenticeship Committee (Committee) administers the approved apprenticeship standards for the boilermaker craft in the Lathrop area. The Committee is composed of equal numbers of persons appointed by labor and management. See Cal. Labor Code § 3075 (West Supp.1989).
 
 
 8
 For willful noncompliance with section 1777.5's requirements, a contractor is subject to civil penalties and debarment from bidding on public works contracts for one year. Id. § 1777.7. The parties do not dispute that section 1777.5 applies to the Lathrop project, or that Hydrostorage neither applied to the Committee for a certificate of approval nor employed any apprentices on the project.
 
 
 9
 On September 25, 1986, the Committee filed a complaint regarding the Lathrop project with the Division. The Division investigated the allegations and issued an administrative complaint against Hydrostorage on January 26, 1987. The administrative complaint alleged that Hydrostorage had violated section 1777.5 by failing to (1) apply for permission to employ and train apprentices, (2) make timely contributions to the apprenticeship trust fund, and (3) employ apprentices in the legally required ratio. The complaint was scheduled to be heard before a hearing officer on May 14, 1987.
 
 
 10
 On May 13, one day before the administrative hearing was scheduled to take place, Hydrostorage filed an action in federal court, seeking a declaration that section 1777.5 was preempted by ERISA and the NLRA. Hydrostorage also sought a preliminary injunction against the administrative proceedings. At a hearing on May 13, 1987, the district judge refused to issue a temporary restraining order (TRO) against the administrative hearing. The administrative hearing took place as scheduled on the following day.
 
 
 11
 After various motions were filed in the federal action, the district court entered an order of abstention on September 25, 1987, based upon the existence of pending state judicial or administrative proceedings.
 
 
 12
 Two days later, on September 27, 1987, the administrative determination was issued. The Director of the Division found that Hydrostorage had willfully violated section 1777.5 "by failing to apply to the [Committee] for approval to train apprentices in the Lathrop Project [and] by failing to employ the mandatory ratio of apprentices to journeymen on the Lathrop project." The Director ordered Hydrostorage barred from bidding on public works contracts for one year and assessed a civil penalty. Id.
 
 
 13
 Although the administrative complaint had alleged that Hydrostorage had violated section 1777.5 by "fail[ing] to make timely contributions to the training fund or the California Apprenticeship Council," the Division found no willful violation of this charge. Instead, the Division regarded Hydrostorage's contributions to the Council, a state agency, as sufficient to satisfy the statutory requirement.
 
 
 14
 Hydrostorage filed a timely administrative appeal of the determination to the Council's Appeal Board. See id. § 3082. The Council issued its decision on January 28, 1988, reversing the administrator's determination that Hydrostorage had willfully failed to train apprentices in the required ratio, but affirmed the determination that Hydrostorage had willfully failed to apply for approval to train apprentices.
 
 
 15
 Hydrostorage then returned to federal district court. On March 3, 1988, Hydrostorage filed an amended complaint in its original action and again sought a TRO, this time to prevent the Council's decision from being enforced. Hydrostorage also filed a second federal action alleging virtually identical claims and asserting subject matter jurisdiction under both diversity and federal question statutes. In the second action, Hydrostorage sought an injunction as well as a writ of mandate pursuant to California Code of Civil Procedure § 1094.5, which permits review in state court of final administrative orders. See Cal. Civil Proc.Code § 1094.5 (West Supp.1989).
 
 
 16
 A hearing on the TRO application was held on March 3, 1988, before the district judge presiding over Hydrostorage's original action. The judge denied Hydrostorage's request for a TRO, stayed the effect of the Council's administrative order, ordered Hydrostorage's two actions consolidated, and scheduled a hearing on Hydrostorage's motion for summary judgment for April 15.
 
 
 17
 After the hearing, on May 4, 1988, the district court, in a published opinion and order, granted Hydrostorage's motion for summary judgment in the consolidated cases. Hydrostorage, Inc. v. Northern California Boilermakers Local Joint Apprenticeship Committee, 685 F.Supp. 718 (N.D.Cal.1988). The court's ruling was based on two independent grounds: the administrative order was preempted both by ERISA and by the NLRA. Id. at 720-25. The court was careful not to rule on whether section 1777.5 was preempted by either ERISA or the NLRA. See id. at 723 ("The Court has not been asked to strike down § 1777.5 nor does it do so by this order which holds only that as applied in this case it is preempted by ERISA.") (emphasis added); id. at 725 ("Because application of the [administrative] determination and order would in this case have th[e] effect [of requiring Hydrostorage to become a party to a collective bargaining agreement], it is barred by the NLRA...."). From this summary judgment, the Committee, Division, and Council filed separate timely appeals, which were consolidated.
 
 II
 
 18
 Boilermakers first argue that the district court lacked subject matter jurisdiction. This issue presents a question of law which we review de novo. Guadamuz v. Bowen, 859 F.2d 762, 766 (9th Cir.1988).
 
 
 19
 The district court did not explain why it had subject matter jurisdiction under 28 U.S.C. § 1331, but merely cited footnote 14 of Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (Shaw ). 685 F.Supp. at 719. Shaw involved a challenge to two New York statutes governing pregnancy benefits on the grounds that they were preempted by ERISA. Shaw, 463 U.S. at 88, 103 S.Ct. at 2895. Plaintiffs were employers who maintained ERISA employee benefit plans which provided certain medical and disability benefits. Id. at 92, 103 S.Ct. at 2897. In a footnote, the Court explained:
 
 
 20
 The Court's decision today in Franchise Tax Board v. Construction Laborers Vacation Trust [463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ], does not call into question the lower courts' jurisdiction to decide these cases. Franchise Tax Board was an action seeking a declaration that state laws were not pre-empted by ERISA. Here, in contrast, companies subject to ERISA regulation seek injunctions against enforcement of state laws they claim are pre-empted by ERISA, as well as declarations that those laws are pre-empted.
 
 
 21
 It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. See Ex parte Young, 209 U.S. 123, 160-62 [28 S.Ct. 441, 454-55, 52 L.Ed. 714] (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve. This Court, of course, frequently has resolved pre-emption disputes in a similar jurisdictional posture.
 
 
 22
 Id. at 96 n. 14, 103 S.Ct. at 2899 n. 14 (citations omitted) (emphasis in original).
 
 
 23
 The Council attempts to distinguish Shaw by arguing that unlike the plaintiffs there, Hydrostorage is not an "employer" within the meaning of ERISA. See 29 U.S.C. § 1002(5) (defining "employer" for ERISA purposes as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan"). This argument suggests that footnote 14 distinguishes Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), as turning on the presence in Shaw of "companies subject to ERISA regulation." Shaw, 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14. The Council further argues that because Hydrostorage is not an "employer" under ERISA, it cannot state a claim under 29 U.S.C. § 1132(a), which authorizes various persons to bring civil actions for ERISA violations. 29 U.S.C. § 1132(a) (authorizing actions to enforce ERISA by Secretary of Labor, and by participants, fiduciaries, or beneficiaries of ERISA trusts); see also Fentron Industries, Inc. v. National Shopmen Pension Fund, 674 F.2d 1300, 1305 & n. 6 (9th Cir.1982) (employers may also sue under 29 U.S.C. § 1132). Nor, according to the Council, is Hydrostorage either a "participant" or a "beneficiary" of an ERISA fund, as those terms are defined by statute. 29 U.S.C. § 1002(2)(B)(7) & (8). Thus, argues the Council, the district court lacked subject matter jurisdiction.
 
 
 24
 The Council misconceives the nature of this action and the meaning of the Shaw footnote. This is not an action brought directly under 29 U.S.C. § 1132(a). It is an action for injunctive and declaratory relief from state regulation based on federal question jurisdiction, 28 U.S.C. § 1331. See New Orleans Public Service, Inc. v. New Orleans, 782 F.2d 1236, 1240-41 (5th Cir.) (New Orleans), amended, 798 F.2d 858 (1986), cert. denied, 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987). As the Court in Shaw asserted, "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, ... presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." 463 U.S. at 96 n. 14, 103 S.Ct. at 2899 n. 14 (emphasis added); see also Lawrence County v. Lead-Deadwood School District No. 40-1, 469 U.S. 256, 259 n. 6, 105 S.Ct. 695, 697 n. 6, 83 L.Ed.2d 635 (1985). This rule has been applied in numerous cases in this and other circuits. See, e.g., Martori Brothers Distributors v. James-Massengale, 781 F.2d 1349, 1353 (9th Cir.) (Martori ), amended, 791 F.2d 799, cert. denied, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 385 (1986); Southern Pacific Transportation Co. v. Public Utilities Commission, 716 F.2d 1285, 1288 (9th Cir.1983), cert. denied, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984); Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229, 236-37 (1st Cir.1987); New Orleans, 782 F.2d at 1240-41; Aluminum Co. of America v. Utilities Commission of North Carolina, 713 F.2d 1024, 1028 (4th Cir.1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); Pacific Merchant Shipping Association v. Aubry, 709 F.Supp. 1516, 1521-22 (C.D.Cal.1989). Here, Hydrostorage is seeking, among other remedies, injunctive relief from state regulation, arguing that the underlying state statutes are preempted under the supremacy clause by ERISA. In a case such as this, the supremacy clause and the federal statute provide subject matter jurisdiction under 28 U.S.C. § 1331. We conclude that the district court had jurisdiction under 28 U.S.C. § 1331.
 
 III
 
 25
 The Council next argues that the district court should have abstained from exercising jurisdiction under either the Pullman or Younger abstention doctrines. The Council argues that this court "has the authority to apply the doctrine of abstention regardless of whether the issue was raised before the District Court or even before this Court." We agree. See Bellotti v. Baird, 428 U.S. 132, 143-44 n. 10, 96 S.Ct. 2857, 2864-65 n. 10, 49 L.Ed.2d 844 (1976) (abstention may be properly raised sua sponte ); Richardson v. Koshiba, 693 F.2d 911, 915 (9th Cir.1982) (though neither party briefed issue of Pullman abstention, panel raised it at oral argument and disposed of case on this ground). But we are not required to do so since it does not implicate our subject matter jurisdiction. See Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 479-80, 97 S.Ct. 1898, 1903-04, 52 L.Ed.2d 513 (1977); Universal Amusement Co. v. Vance, 587 F.2d 159, 163 n. 6 (5th Cir.1978) (en banc) ("Appellant did not raise the question of Younger abstention [on appeal], and that issue, being nonjurisdictional, is thus not before this court."), aff'd, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam); Schachter v. Whalen, 581 F.2d 35, 36 n. 1 (2d Cir.1978) ("Younger abstention goes to the exercise of equity jurisdiction, not to the jurisdiction of the federal district court as such to hear the case.").
 
 
 26
 Although the district court abstained under Younger pending completion of the state administrative proceedings, it heard and decided Hydrostorage's motion for summary judgment after the Council's decision was rendered. None of the appellants argued in the district court for abstention under Younger or Pullman after the Council decided Hydrostorage's administrative appeal. Under these circumstances, when the district court did not consider the issue, we decline to address abstention on appeal. See Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F.2d 1103, 1115-16 n. 19 (9th Cir.1987) (since party did not raise abstention issues in trial court, appellate court need not consider them on appeal).
 
 IV
 
 27
 Boilermakers next argue that the district court erred in concluding that ERISA preempts the administrative order in this case. We review a summary judgment de novo. Rutledge v. Arizona Board of Regents, 859 F.2d 732, 734 (9th Cir.1988); General Motors Corp. v. California State Board of Equalization, 815 F.2d 1305, 1309 (9th Cir.1987) (summary judgment based on ERISA-preemption reviewed de novo), cert. denied, 485 U.S. 941, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988). Because there are no contested issues of fact, we need decide only whether the substantive law was applied correctly. Martori, 781 F.2d at 1351.
 
 
 28
 ERISA is a "comprehensive remedial statute 'designed to protect the interest of employees in pension and welfare plans, and to protect employers from conflicting and inconsistent state and local regulation of such plans.' " Local Union 598, Plumbers & Pipefitters Industry Journeymen & Apprentices Training Fund v. J.A. Jones Construction Co., 846 F.2d 1213, 1217 (9th Cir.) (Jones ), aff'd, --- U.S. ----, 109 S.Ct. 210, 102 L.Ed.2d 202 (1988), quoting Scott v. Gulf Oil Corp., 754 F.2d 1499, 1501 (9th Cir.1985). The statute "sets forth reporting and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators, and establishes schedules for the vesting and accrual of pension benefits." Massachusetts v. Morash, --- U.S. ----, 109 S.Ct. 1668, 1671-72, 104 L.Ed.2d 98 (1989) (Morash ).
 
 
 29
 ERISA governs "employee benefit plans," which are statutorily defined as plans that are either an "employee welfare benefit plan," an "employee pension benefit plan," or both. 29 U.S.C. § 1002(3); Morash, 109 S.Ct. at 1672. The statute defines "employee welfare benefit plan" as follows:
 
 
 30
 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services....
 
 
 31
 29 U.S.C. § 1002(1) (emphasis added).
 
 
 32
 ERISA contains a very broad preemption clause. Section 514(a) of ERISA, as codified at 29 U.S.C. § 1144(a), provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title...." 29 U.S.C. § 1144(a) (emphasis added). "State laws" are defined as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). A "state" is defined as "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." 29 U.S.C. § 1144(c)(2).
 
 
 33
 Several exceptions exist to ERISA's broad preemption clause. Only one such exception is relevant to this case, however: ERISA's so-called "savings clause." Section 514(d) of ERISA, codified at 29 U.S.C. § 1144(d), provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d).
 
 
 34
 Applying these statutory provisions, the district court held that the Council's order was preempted by ERISA. 685 F.Supp. at 723. The district court first reasoned that "the Apprenticeship Program under the Boilermakers collective bargaining agreement" constituted an ERISA employee welfare benefit plan. Id. at 721. Next, the court determined that the administrative order against Hydrostorage was preempted under section 514(a), 29 U.S.C. § 1144(a). Id. Finally, the court held that the administrative order was not saved by section 514(d), ERISA's savings clause. Id. at 723.
 
 
 35
 On appeal, Boilermakers have challenged each of these three steps in the district court's analysis. We address them in turn.
 
 A.
 
 36
 We first consider whether this case involves an "employee benefit plan," a necessary predicate for the applicability of ERISA. The parties do not contend that any "employee pension benefit plan" is involved here. Instead, they properly focus on whether there is an "employee welfare benefit plan." To answer this question, we must consider whether this case involves a "plan, fund, or program ... established or maintained by an employer or by an employee organization, or by both, ... for the purpose of providing for its participants ... apprenticeship or other training programs." 29 U.S.C. § 1002(1) (emphasis added).
 
 
 37
 ERISA does not define the terms "plan," "fund," "program," or "apprenticeship training program." See Morash, 109 S.Ct. at 1672. Regulations issued by the Secretary of Labor under authority delegated by statute similarly fail to define these terms. See 29 C.F.R. § 2510.3-1 (1988); 29 U.S.C. § 1135. Moreover, of the very few reported decisions involving ERISA and apprenticeship funds or programs, none defines or analyzes the term "apprenticeship training program." In the absence of such guidance, we "must give effect to [the statute's] plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning." Shaw, 463 U.S. at 97, 103 S.Ct. at 2900; see also id. at 97 n. 16, 103 S.Ct. at 2900 n. 16 (quoting Black's Law Dictionary definitions in determining the meaning of phrase "relates to" in ERISA's preemption clause).
 
 
 38
 The district court applied the plain meaning of the statute. In explaining why this case involved an employee welfare benefit plan, the district court wrote:
 
 
 39
 There can be no question that the Apprenticeship Program under the Boilermakers collective bargaining agreement falls within the literal scope of [29 U.S.C. § 1002(1)'s] definition. It comprises a plan, fund, and program maintained by employers and the bargaining representative of their employees to provide its participants with apprenticeship training. That the Apprenticeship Fund itself may also be governed to an extent by other federal laws, as [the Division] argues, in no way takes the Apprenticeship Program out of the statutory definition.
 
 
 40
 685 F.Supp. at 721 (footnote omitted). It is unclear to us precisely what the district court meant by the "Apprenticeship Program." This term conceivably could encompass the apprenticeship trust fund, the Standards, and even the Committee.
 
 
 41
 A "fund" has been defined as "[a]n asset or group of assets set aside for a specific purpose," or "[a] sum of money or other liquid assets set apart for a specific purpose, or available for the payment of debts or claims." Black's Law Dictionary 606 (5th ed. 1979). A "plan" has been described as "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object. [A] [m]ethod of putting into effect an intention or proposal." Id. at 1036 (citation omitted). Although Black's Law Dictionary does not supply a definition of "program," another prominent dictionary defines a program as a "plan of procedure," "schedule or system under which action may be taken toward a desired goal," or "proposed project or scheme." Webster's Third New International Dictionary 1812 (1971).
 
 
 42
 We recently held that an apprenticeship training fund is an employee welfare benefit plan under ERISA. Jones, 846 F.2d at 1217 ("Since the [local apprenticeship fund] is established to provide 'apprenticeship or other training programs,' it is an 'employee welfare benefit plan' within the meaning of ERISA."). The parties agree that the Boilermakers' apprenticeship trust fund (Fund) qualifies as an ERISA employee benefit plan.
 
 
 43
 A more difficult question is whether the Standards constitute an "employee welfare benefit plan," i.e., a "plan" or "program" which was "established or maintained by an employer or by an employee organization, or by both, ... for the purpose of providing for its participants ... apprenticeship or other training programs." 29 U.S.C. § 1002(1). We conclude that the Standards satisfy this definition. The Standards consist of a detailed, 16-page document which specifies the duties and procedure of the Committee, the minimum qualifications of apprentices, the maximum ratio of apprentices to journeymen on job locations, the terms and conditions of apprenticeships, and the hours and wages of apprentices. The Standards also provide for supplemental instruction as well as periodic examination of apprentices. The Standards clearly embody "a method of design or action, procedure, or arrangement for accomplishment of a particular ... object," in this case the training of apprentices. Black's Law Dictionary 1036 (5th ed.1979). In addition, there is no question that the Standards were established "for the purpose of providing for its participants ... apprenticeship or other training programs." 29 U.S.C. § 1002(1). The Standards's stated purpose is "the training of Boilermakers, skilled in all phases of the erection and repair industry, who will be a credit to the industry." Finally, the Standards were established by the Committee, an entity created by the collective bargaining agreement and composed of equal numbers of representatives of labor and management. As such, the Committee qualifies as "an employer or ... employee organization, or ... both." Id.
 
 
 44
 The Standards are an integral part of a larger "program" established for the purpose of providing "apprenticeship ... training." Id. Thus, both the Fund and the Standards fall within the definition of an "employee welfare benefit plan" under ERISA.
 
 
 45
 We need not decide whether the Committee itself, whose functions include the formulation and administration of the Standards, is also part of the employee welfare benefit plan. The Division strenuously argues that while the Fund is an ERISA plan, the Committee is not. The resolution of this issue has no bearing on our decision. Since the Standards and Fund constitute an ERISA plan, this case clearly falls within the coverage of ERISA.
 
 
 46
 The Division argues, however, that we should eschew a literal interpretation of ERISA's definition and defer instead to Congress's broader purpose behind the statute. While the Supreme Court has recognized that various provisions in ERISA are " 'perhaps ... not a model of legislative drafting,' " Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (Pilot Life) (referring to preemption and insurance savings clauses), quoting Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985) (Metropolitan Life ), and that in particular the term "employee benefit plan" is "defined only tautologically in the statute," Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 8, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987) (Coyne ), it also frequently has looked to the plain meaning of statutory language. See id. at 7-8, 107 S.Ct. at 2215-2216; Metropolitan Life, 471 U.S. at 740, 105 S.Ct. at 2389; Shaw, 463 U.S. at 97 & n. 16, 103 S.Ct. at 2900 & n. 16. In addition, the Division acknowledges that ERISA's legislative history fails to address what "plan, fund or program" means in the context of apprenticeship training programs. Perhaps the reason for this is that Congress, in enacting ERISA, focused on the regulation of employee pension benefit plans and spent little time considering employee welfare benefit plans. See Brummond, Federal Preemption of State Insurance Regulation Under ERISA, 62 Iowa L.Rev. 57, 113-22 (1976).
 
 
 47
 The Division's argument is essentially one for statutory revision and is properly directed to the Legislative Branch. See Shaw, 463 U.S. at 106, 103 S.Ct. at 2904 ("To the extent that our construction of ERISA causes any problems in the administration of state fair employment laws, those problems are the result of congressional choice and should be addressed by congressional action."). The statute is clear on its face. Our commission is to follow its precepts. We are not allowed to amend the statute through the Division's suggested interpretation. We conclude that the Standards and Fund are an ERISA plan.
 
 B.
 
 48
 We must next consider whether the Council's order falls under ERISA's preemption clause, which preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). In recent years, the Supreme Court has examined the scope of ERISA preemption on numerous occasions. See, e.g., Morash, 109 S.Ct. 1668; Mackey v. Lanier Collections Agency & Service, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (Mackey ); Coyne, 482 U.S. 1, 107 S.Ct. 2211; Pilot Life, 481 U.S. 41, 107 S.Ct. 1549; Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); Metropolitan Life, 471 U.S. 724, 105 S.Ct. 2380; Shaw, 463 U.S. 85, 103 S.Ct. 2890; Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (Alessi ). The Court has stated that "the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.' " Pilot Life, 481 U.S. at 45-46, 107 S.Ct. at 1551-52, quoting Alessi, 451 U.S. at 523, 101 S.Ct. at 1906.
 
 
 49
 There is no question that the Council's administrative order against Hydrostorage constitutes a "state law" within the meaning of ERISA. See 29 U.S.C. § 1144(c)(1) (defining "state laws" as "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State"). The Council's order has the effect of law in California. Furthermore, the Council comes within ERISA's definition of a "state" because it is included within "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter." 29 U.S.C. § 1144(c)(2).
 
 
 50
 More difficult is the issue of whether the administrative order "relates to" an ERISA employee benefit plan. We have required that a state law both "relate to," 29 U.S.C. § 1144(a), and "purport[ ] to regulate, directly or indirectly," 29 U.S.C. § 1144(c), an employee welfare benefit plan in order for it to be preempted. Jones, 846 F.2d at 1218; Martori, 781 F.2d at 1356. " 'A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " Shaw, 463 U.S. at 96-97, 103 S.Ct. at 2899-900. A law purports to regulate a plan if it attempts to reach in one way or another the terms and conditions of employee benefit plans. Jones, 846 F.2d at 1218; Lane v. Goren, 743 F.2d 1337, 1339 (9th Cir.1984).
 
 
 51
 Boilermakers argue that section 1777.5 does not "relate to" or "purport to regulate" an ERISA plan. The district court reasoned that the Council's order "relates to" an ERISA plan because it "compel[s] Hydrostorage to participate in and contribute to the Boilermakers Apprenticeship Program" and because section 1777.5, upon which the order was based, "establishes the manner in which contractors must participate in the Apprenticeship Program and fund its costs." 685 F.Supp. at 721. As for our additional requirement that the challenged state law "purport[ ] to regulate, directly or indirectly" an ERISA plan, the district court concluded that "there can be no question but that § 1777.5 regulates apprenticeship program[s]." Id. at 721 n. 6. Although we disagree with some of the district court's reasoning, we agree with its conclusion that the administrative order against Hydrostorage falls under ERISA's preemption clause.
 
 
 52
 First, the order clearly "relates to" the Standards, which are part of an ERISA plan. Hydrostorage was sanctioned for failing to apply to the Committee for permission to train apprentices on the Lathrop project. The very purpose of requiring Hydrostorage to apply was so that Hydrostorage would become bound by the Standards, an ERISA plan. Hydrostorage would have been required to sign a DAS-7 form entitled "Agreement to Train Apprentices." By signing a DAS-7 form, Hydrostorage would agree "to train apprentices in the designated occupation in accordance with the apprenticeship standards and apprenticeship agreement and to comply with the provisions thereof." The "apprenticeship standards" in this case are the Standards, an ERISA plan. Thus, the order undoubtedly "relates to" an ERISA plan in the sense that the order has a "connection with or reference to" the Standards.
 
 
 53
 Second, we conclude that the administrative order "purports to regulate, indirectly or directly," an ERISA plan. Again, the order's purpose is to require Hydrostorage and other contractors on public works projects to become bound by the Standards, an ERISA plan. See Metropolitan Life, 471 U.S. at 739, 105 S.Ct. at 2388 (Massachusetts law requiring ERISA plans to provide minimum coverage for mental health care expenses "bears indirectly but substantially" on plans since "it requires them to purchase the mental-health benefits specified in the statute"). The order is designed to enforce the terms of an ERISA plan. The same is true of the statute upon which the order was based, California Labor Code § 1777.5. Section 1777.5 is aimed at enforcing the terms of an ERISA plan, the Standards, and compelling nonsignatory contractors to join or comply with such plans. The underlying statute is therefore one which is specifically designed to affect employee benefit plans. See Mackey, 108 S.Ct. at 2185 ("[W]e have virtually taken it for granted that state laws which are specifically designed to affect employee benefit plans are preempted under § 514(a).") (citations and internal quotations omitted). We therefore conclude that the administrative order falls within ERISA's preemption clause.
 
 
 54
 The Committee argues, however, that section 1777.5 does not "purport to regulate" because it "applies only when the state is purchasing services in the marketplace, and simply expresses a decision as to the terms upon which the state chooses to do business." In essence, the Committee argues that California is acting as a "marketplace participant," not a regulator. The Committee relies on a series of dormant commerce clause cases which discuss the market participant theory.
 
 
 55
 There are two reasons why we reject the Committee's "market participant" argument. First, as the Supreme Court observed in rejecting a similar argument in a case involving NLRA preemption, Wisconsin Department of Industry, Labor and Human Relations v. Gould, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), "the 'market participant' doctrine reflects the particular concerns underlying the Commerce Clause, not any general notion regarding the necessary extent of state power in areas where Congress has acted." Id. at 289, 106 S.Ct. at 1062; see also id. at 290, 106 S.Ct. at 1063 ("What the Commerce Clause would permit States to do in the absence of the NLRA is ... an entirely different question from what States may do with the Act in place."). Second, California in this case is not acting merely as a "market participant" rather than a regulator. The state's involvement does not end with the awarding of the contract. Section 1777.5 is aimed at regulating contractors who work on public contracts. The Division, part of a state agency, monitors and enforces violations of section 1777.5. This amounts to regulation, not merely "market participation."
 
 C.
 
 56
 Finally, Boilermakers argue that section 1777.5 is saved from preemption by section 514(d) of ERISA, codified at 29 U.S.C. § 1144(d), which provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States ... or any rule or regulation issued under any such law." Boilermakers argue that the administrative order is saved in light of the Fitzgerald Act, 29 U.S.C. § 50 et seq., which provides:
 
 
 57
 The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship....
 
 
 58
 29 U.S.C. § 50. These apprenticeship standards are set forth at 29 C.F.R. § 29.1-29.13 (1988). The regulations provide "a detailed regulatory scheme defining apprenticeship programs and their requirements, and establish a review, approval, and registration process for proposed apprenticeship programs administered by State Apprenticeship Councils under the aegis of the United States Department of Labor." Siuslaw Concrete Construction Co. v. Washington, Department of Transportation, 784 F.2d 952, 956 (9th Cir.1986).
 
 
 59
 Boilermakers argue that section 514(d), which saves "any rule or regulation issued under any [law of the United States]," saves section 1777.5 from preemption because section 1777.5 promotes and encourages the spread of approved apprenticeship programs established under the auspices of the Fitzgerald Act and the regulations of the Secretary of Labor.
 
 
 60
 The district judge addressed Boilermakers' argument at length, see 685 F.Supp. at 721-23, concluding that "[b]y no stretch of the imagination could § 1777.5 be considered a state law the preemption of which would impair federal law." Id. at 722. The court reasoned:
 
 
 61
 The Fitzgerald Act merely directs the Secretary of Labor "to formulate and promote the furtherance of labor standards ... to safeguard the welfare of apprentices" and related objectives. 29 U.S.C. § 50. The implementing regulations state that their purpose is "to set forth labor standards to safeguard the welfare of apprentices, and to extend the application of such standards by prescribing policies and procedures concerning the registration, for certain Federal purposes, [of] acceptable apprenticeship programs." 29 C.F.R. § 29.1(b). Thus the regulations relate only to eligibility for federal registration. Neither they nor the Act itself contemplate enforcement mechanisms; Section 29.11 merely provides for the voluntary adjustment of complaints before either federal or state agencies. Assuming § 1777.5 was adopted in furtherance of the objectives of the Fitzgerald Act, it clearly is not an enforcement mechanism of federal law and to the extent orders under this section are preempted by ERISA, federal law is not impaired.
 
 
 62
 Id. We adopt the district court's reasoning.
 
 
 63
 As they did in the district court, Boilermakers seek to invoke the Supreme Court's decision in Shaw to support their claim that section 514(d) saves the administrative order and California Labor Code § 1777.5 from preemption. In Shaw, appellants argued that section 514(d) saved a New York human rights law which forbid discrimination in employee benefit plans on the basis of pregnancy. 463 U.S. at 100-06, 103 S.Ct. at 2901-04. Appellants in Shaw argued that preemption of the New York statute would "impair" or "modify" Title VII of the federal Civil Rights Act of 1964. Id. at 100-01, 103 S.Ct. at 2901-02. The Court accepted this argument, but only insofar as the New York law prohibited employment practices that were also unlawful under Title VII. See also id. at 103-04, 103 S.Ct. at 2903-04 (New York statute not saved to the extent that it "prohibit[s] conduct that federal law permit[s]" since Title VII "in no way depends on such extensions for its enforcement"). The Court's holding in Shaw that parts of the state law were saved rested on (1) the presence in Title VII of a clause explicitly preserving nonconflicting state laws, and (2) Title VII's requirement that a claimant, before filing a charge with the federal Equal Employment Opportunity Commission (EEOC), first pursue available state administrative remedies. Id. at 101-02, 103 S.Ct. at 2902-03. The Court concluded:
 
 
 64
 Given the importance of state fair employment laws to the federal enforcement scheme, preemption of the Human Rights Law would impair Title VII to the extent that the Human Rights Law provides a means of enforcing Title VII's commands. Before the enactment of ERISA, an employee claiming discrimination in connection with a benefit plan would have had his complaint referred to the New York State Division of Human Rights. If ERISA were interpreted to pre-empt the Human Rights Law entirely with respect to covered benefit plans, the State no longer could prohibit the challenged employment practice and the state agency no longer would be authorized to grant relief. The EEOC thus would be unable to refer the claim to the state agency. This would frustrate the goal of encouraging joint state/federal enforcement of Title VII; an employee's only remedies for discrimination prohibited by Title VII in ERISA plans would be federal ones. Such a disruption of the enforcement scheme contemplated by Title VII would, in the words of § 514(d), "modify" and "impair" federal law.
 
 
 65
 Id. at 102, 103 S.Ct. at 2902 (emphasis added) (footnote omitted). The Court's conclusion clearly rested upon the fact that the New York law functioned as an enforcement mechanism for Title VII. That is simply not the case here. The Fitzgerald Act does not articulate a "goal of encouraging joint state/federal enforcement." Nor does the Fitzgerald Act contain any clause which preserves state laws. See also 685 F.Supp. at 722 (rejecting attempt to rely on Shaw ).
 
 
 66
 We reject Boilermakers' argument that the Fitzgerald Act embodies a project in "cooperative federalism" which will be "impaired" or "modified" within the meaning of section 514(d) if the administrative order against Hydrostorage were preempted by ERISA. This argument relies on an overbroad reading of Shaw and on dicta in an out-of-circuit decision. See Rebaldo v. Cuomo, 749 F.2d 133, 139-40 (2d Cir.1984) (Van Graafeiland, J., "writing only for himself and not his colleagues" on issue of whether state law which panel concluded was not preempted under section 514(a) would also be saved under section 514(d), if it had been preempted), cert. denied, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). As the Court instructed in Shaw, ERISA's structure and legislative history "caution against applying [section 514(d) ] too expansively." 463 U.S. at 104, 103 S.Ct. at 2903. "While § 514(d) may operate to exempt provisions of state law, upon which federal laws depend for their enforcement, the combination of Congress' enactment of an all-inclusive pre-emption provision and its enumeration of narrow, specific exceptions to that provision makes us reluctant to expand § 514(d) into a more general saving clause." Id. We conclude that the Council's order is not saved from preemption by section 514(d) of ERISA. We also hold that as applied in the Council's order, section 1777.5 is not saved from ERISA preemption. However, like the district court, we do not address whether section 1777.5 in its entirety is preempted by ERISA. 685 F.Supp. at 723.
 
 
 67
 Because we affirm the district court's judgment on the grounds that the Council's order is preempted by ERISA, we need not reach the issue of NLRA preemption.
 
 
 68
 AFFIRMED.
 
 
 
 *
 Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation
 
 
 [1]
 Section 1777.5 of the Labor Code provides in part:
 Every ... apprentice [employed on a public works project] shall be paid the standard wage paid to apprentices under the regulations of the craft or trade at which he is employed, and shall be employed only at the work of the craft or trade to which he is registered.
 Only apprentices ... who are in training under apprenticeship standards and written apprentice agreements ... are eligible to be employed on public works. The employment and training of each apprentice shall be in accordance with the provisions of the apprenticeship standards and apprentice agreements under which he is training.
 When the contractor to whom the contract is awarded by the state or any political subdivision, or any subcontractor under him, in performing any of the work under the contract or subcontract, employs workmen in any apprenticeable craft or trade, the contractor and subcontractor shall apply to the joint apprenticeship committee administering the apprenticeship standards of the craft or trade in the area of the site of the public work for a certificate approving the contractor or subcontractor under the apprenticeship standards for the employment and training of apprentices in the area or industry affected; provided, however, that the approval as established by the joint apprenticeship committee or committees shall be subject to the approval of the Administrator of Apprenticeship. The joint apprenticeship committee or committees, subsequent to approving the subject contractor or subcontractor, shall arrange for the dispatch of apprentices to the contractor or subcontractor in order to comply with this section. There shall be an affirmative duty upon the joint apprenticeship committee or committees administering the apprenticeship standards of the craft or trade in the area of the site of the public work to ensure equal employment and affirmative action in apprenticeship for women and minorities. Contractors or subcontractors shall not be required to submit individual applications for approval to local joint apprenticeship committees provided they are already covered by the local apprenticeship standards. The ratio of apprentices to journeymen who shall be employed in the craft or trade on the public work may be the ratio stipulated in the apprenticeship standards under which the joint apprenticeship committee operates, but in no case shall the ratio be less than one apprentice for each five journeymen, except as otherwise provided in this section.
 The contractor or subcontractor, if he is covered by this section, upon the issuance of the approval certificate, or if he has been previously approved in such craft or trade, shall employ the number of apprentices or the ratio of apprentices to journeymen stipulated in the apprenticeship standards. Upon proper showing by the contractor that he employs apprentices in such craft or trade in the state on all of his contracts on an annual average of not less than one apprentice to each five journeymen, the Division of Apprenticeship Standards may grant a certificate exempting the contractor from the 1-to-5 ratio as set forth in this section. This section shall not apply to contracts of general contractors involving less than thirty thousand dollars ($30,000) or 20 working days or to contracts of specialty contractors not bidding for work through a general or prime contractor, involving less than two thousand dollars ($2,000) or fewer than five working days.
 ....
 A contractor to whom the contract is awarded, or any subcontractor under him, who, in performing any of the work under the contract, employs journeymen or apprentices in any apprenticeable craft or trade and who is not contributing to a fund or funds to administer and conduct the apprenticeship program in any such craft or trade in the area of the site of the public work, to which fund or funds other contractors in the area of the site of the public work are contributing, shall contribute to the fund or funds in each craft or trade in which he employs journeymen or apprentices on the public work in the same amount or upon the same basis and in the same manner as the other contractors do, but where the trust fund administrators are unable to accept such funds, contractors not signatory to the trust agreement shall pay a like amount to the California Apprenticeship Council. The contractor or subcontractor may add the amount of such contributions in computing his bid for the contract.